**SECOND DIVISION**
**ANDREWS, P. J.,**
**MILLER and BRANCH, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**July 14, 2015**

# In the Court of Appeals of Georgia

A15A0396. CASTLE POINT HOMEOWNERS ASSOCIATION,
INC. v. SIMMONS.

BRANCH, Judge.

A real estate developer borrowed almost $2 million from a bank to develop a fourteen-lot subdivision and signed a related security deed with the bank encumbering seven of the lots in the subdivision. The developer subsequently created a homeowners association and recorded certain covenants pertaining to the development. After most of the lots were developed, the developer defaulted on the loan, and the bank foreclosed on five of the undeveloped lots. One of the foreclosed lots was eventually sold to Phyllis Simmons, and the homeowners association demanded that Simmons comply with the requirements of the recorded covenants. Simmons refused, the association filed suit, and the trial court granted summary

judgment in favor of Simmons on that ground that the covenants were not enforceable against her because they were recorded after the security deed to the bank was recorded and thus not a part of Simmons's chain of title. For the reasons shown below, we reverse.

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). We review a grant or denial of summary judgment de novo and construe the evidence in the light most favorable to the nonmovant. *Home Builders Assn. of Savannah v. Chatham County*, 276 Ga. 243, 245 (1) (577 SE2d 564) (2003).

Construed in favor of the appellant, the record shows that on May 8, 2007, in order to secure a loan in the amount of $1,945,858, Ross Mundy Custom Homes, Inc. (RMCH), executed a deed to secure debt, which was recorded on June 14, 2007, to Mcintosh Commercial Bank for property described as Lots 5, 9, 10, 11, 12, 13, and 14, Phase I, in Castle Point Subdivision as per a plat recorded on April 4, 2007. The security deed does not refer to any restrictive covenants, but it does refer to a recorded plat. The referenced plat does not refer to any covenants associated with the property, but it states that "COMMON AREAS & DETENTION PONDS TO BE OWNED AND MAINTAINED BY HOME OWNERS ASSOC."

On August 8, 2007, RMCH recorded a "Declaration of Covenants, Conditions and Restrictions for Castlepoint Homeowner's Association, Inc." (the "Covenants" and the "HOA," respectively), which, by their terms, apply to "all parties having any right, title, or interest in any portion of the Community, their heirs, successors-in-title, and assigns, and shall inure to the benefit of each owner of any portion of the Community." The Covenants provide for "mutually beneficial restrictions under a general plan of improvement for the benefit of the owners of each portion of the Community," and they seek to enforce a "community-wide standard" with regard to "conduct, maintenance, or other activity generally prevailing throughout the Community." According to the developer, that community-wide standard included the installation of sidewalks along both the lots of completed homes and on the common areas of the community, and it required a consistent architectural scheme throughout the subdivision. There is no evidence in the record that McIntosh ever expressly consented to the application of the Covenants to the lots subject to the security deed.

RMCH built homes on nine of the lots and installed sidewalks on each lot parallel to the street. RMCH, however, was unable to complete the development of the subdivision, and on June 3, 2008, McIntosh foreclosed on Lots 9, 10, 11, 13, and

14 as evidenced by a deed under power. The deed under power does not refer to the recorded Covenants, but states that McIntosh acquired the lots "subject to . . . any . . . restrictions, covenants, and matters of record *superior to* the Security Deed." (Emphasis supplied.) McIntosh also fell on hard times and was placed into receivership by the Federal Deposit Insurance Corporation, which then conveyed Lot 10 to Charterbank per a receiver's deed dated September 9, 2010. The receiver's deed also does not refer specifically to the Covenants. Charterbank in turn conveyed Lot 10 to Simmons on August 27, 2012. The Charterbank-Simmons deed states that it conveys title subject to "permitted exceptions," one of which is "[a]ll matters appearing of record," but it does not otherwise reference the Covenants. On the same day that Charterbank deeded Lot 10 to Simmons, Simmons paid to the Castlepoint HOA a $250 HOA initiation fee and $250 for HOA dues for the year 2012. And in a construction contract for her new residence, Simmons "acknowledge[d] that there [was] a required association fee" of $250 per year.

During and after construction of Simmons's new home on Lot 10, a dispute arose between the HOA and Simmons about (1) whether Simmons was required to install a sidewalk along the street-side edge of her property, (2) the color of her roof and driveway, and (3) the fact that she installed a buried propane tank. Meanwhile,

4

on July 22, 2013, Simmons obtained a loan from Primary Residential Mortgage, Inc. (PRM), secured by a deed to secure debt to Mortgage Electronic Registrations Systems, Inc. (MERS), as the nominee for Primary. The Simmons-MERS security deed includes a "Planned Unit Development Rider" (the "PUD"), signed by Simmons on the same day, through which Simmons agreed that the secured property included

> a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in THE COVENANTS, CONDITIONS AND RESTRICTIONS FILED OF RECORD THAT AFFECT THE PROPERTY (the 'Declaration'). The Property is a part of a planned unit development known as Castle Point. The Property also includes *Borrower's interest* in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD. . . and the uses, benefits and proceeds of Borrower's Interest.

(Emphasis supplied). Further, the PUD, which was incorporated by reference into the security deed, required Simmons to

> perform all of *Borrower's obligations* under the PUD's Constituent Documents. The 'Constituent Documents' are the: (i) Declaration; (ii) Articles of Incorporation, Trust Instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners' Association. Borrower shall

5

promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

(Emphasis supplied). On July 30, 2013, Simmons paid the HOA dues of $250 for the year 2013.

On October 24, 2013, the HOA filed and later amended the present action, alleging that Simmons was required to comply with the Covenants and demanding that Simmons be enjoined from violating the Covenants and required to remove all non-conforming features of her property. Simmons moved for summary judgment based on all of the evidence except the Simmons-MERS security deed and PUD rider, which neither party had placed before the court in connection with the motion for summary judgment. The trial court granted the motion, concluding that the Covenants did not apply to Simmons because none of the deeds in her chain of title submitted Lot 10 to the Covenants; none of the prior owners in her chain of title ever consented to the Covenants; Simmons's chain of title was superior to that of the Covenants because the deed to McIntosh was recorded prior to the Covenants; and the fact that Simmons had knowledge of the existence of a homeowners association in 2012 and 2013 and voluntarily paid fees and dues thereto was insufficient to show that she consented to the Covenants attaching to her property. The court also held that

6

sidewalks were not required by the Rockdale County ordinances, that Rockdale County issued Simmons a certificate of occupancy, and that the HOA did not have standing to enforce county ordinances.

Two weeks after the trial court's decision, the HOA moved for reconsideration, attached the Simmons-MERS security deed and PUD rider, and argued that these documents showed that Simmons had consented to the Covenants. The trial court denied the motion, finding that there was nothing in the PUD wherein Simmons

> agreed that the Subject Property would be subject to the restrictive covenants. While [Simmons] agreed in such Rider to "perform all of Borrower's obligations under the PUD's Constituent Documents," she (the Borrower) had no obligations under such documents since they were outside her chain of title.

The HOA timely filed its notice of appeal from both orders, and, contrary to Simmons's objection, the appeal is properly before us.[1]

We hold that summary judgment was improper because the HOA, at a minimum, raised an issue of fact as to whether Simmons is bound by the general scheme of the subdivision on the theory of implied covenants. Although the trial court

---

[1] This appeal is authorized by OCGA § 9-11-56 (h) ("An order granting summary judgment on any issue or as to any party shall be subject to review by appeal.").

7

correctly held that the relevant covenants were not in Simmons's chain of title,[2] it is nonetheless true that

> [w]here an owner of land subdivides it into lots for the purpose of sale, under a general plan or scheme restricting the lots to certain uses, restrictions that are embodied in such general plan or scheme may in a proper case be imposed upon the lots beyond the express restrictions contained in the deeds to the purchasers, on the theory of implied covenants.

*Kilby v. Sawtell*, 203 Ga. 256 (1) (46 SE2d 117) (1948) (citation omitted); see also *McLean v. Turtle Cove Prop. Assn.*, 222 Ga. App. 709, 710 (1) (475 SE2d 718)

---

[2] The development did not take on the form of a property owners' development until "the recordation of the declaration." OCGA § 44-3-222. Accordingly, McIntosh took title to the property identified in the security deed prior to the creation of the property owners' development and free and clear of any associated restrictive covenants. *Springmont Homeowners Assn. v. Barber*, 221 Ga. App. 713 (472 SE2d 695) (1996). In *Springmont*, a bank took title pursuant to a security deed before restrictive covenants stated in a declaration were imposed on the property. Id. at 713-714. Accordingly, the bank's security deed "had priority over the subsequently recorded Declaration." Id. at 714 (citation omitted). "Although the Declaration bound those taking under the developer, it never became part of the chain of title between the developer and the Bank." Id. Therefore the covenants were not enforceable against Barber, a person who purchased a lot that the bank had foreclosed upon. Id. The *Springmont* court thus concluded that "[b]ecause the deed the Bank conveyed to Barber was unencumbered by the Declaration and the Association failed to present any evidence showing that the Declaration applied despite its clear absence from the chain of title, summary judgment was appropriate." Id.

8

(1996) ("[R]estrictive covenants may apply to lots in a planned development under an implied covenant theory, even if the developer failed to comply with all formalities, as long as the landowner had knowledge of the restrictive covenants at the time he purchased the property.") (citations omitted); *Roth v. Conner*, 235 Ga. App. 866, 868-869 (1) (b) (510 SE2d 550) (1998); *Westhampton, Inc. v. Kehoe*, 227 Ga. 642, 645-646 (182 SE2d 430) (1971); *Wardlaw v. Southern R. Co.*, 199 Ga. 97, 104 (33 SE2d 304) (1945). "[T]he need for such a rule is particularly compelling where third parties have relied on the applicability of the covenants." *McLean*, 222 Ga. App. at 710 (1) (citation omitted). "The party wishing to enforce a non-express agreement must, of course, establish the area covered by the agreement and the specific content of the restrictions alleged. This is usually accomplished by showing a common grantor's general scheme or plan for developing the property in question." *Roth*, 235 Ga. App. at 869 (1) (b).

Several facts of this case show the existence of an implied covenant and distinguish this case from *Springmont*. First, the plat referenced in the McIntosh security deed, which is in Simmons's chain of title,[3] is a "Final Subdivision Plat for

---

[3] "Where a deed to land refers to a map or plat for a more complete description of the land conveyed, such map or plat will ordinarily be considered as incorporated in the deed itself." *Kilby*, 203 Ga. at 257 (3) (b).

9

Castle Point Phase 1" and it shows a planned 14-lot subdivision with common areas and a single street planned to provide access to each of the 14 lots; the plat states that common areas and detention ponds will be owned and maintained by a homeowners' association Thus, the HOA has shown that Simmons had constructive notice of the common grantor's general scheme or plan for the property in question and that a homeowners' association would play a role in that scheme. Second, on the day she closed on the purchase of Lot 10, Simmons joined the HOA and paid the dues for the year 2012. And as of that day, at least nine of the 14 properties — the properties on which a home had already been constructed — had sidewalks already installed. Third, when she obtained a loan on her property in July 2013, she acknowledged that Lot 10 was a part of a PUD known as Castle Point and that the PUD was governed by a homeowners' association and a declaration and covenants, and she agreed to be bound by her obligations thereunder and to pay her dues, which she did during that same month.

"He who takes with notice of an equity takes subject to that equity." OCGA § 23-1-16. And "[n]otice sufficient to excite attention and put a party on inquiry shall be notice of everything to which it is afterwards found that such inquiry might have led. Ignorance of a fact due to negligence shall be equivalent to knowledge in fixing

10

the rights of parties." OCGA § 23-1-17. Here, construed in favor of the HOA, the above facts were sufficient to put Simmons on inquiry of the nature of the existence of a homeowners association, the general scheme of the development, and its declaration and covenants. See also OCGA § 44-3-223 ("Every lot owner and all those entitled to occupy a lot shall comply with all lawful provisions of the property owners' association instrument."). Accordingly, there is an issue of fact as to whether she is bound by the HOA covenants under the theory of implied covenants. See *Westhampton*, 227 Ga. at 645-646 (oral statements to owners of first three phases of development that the restrictions imposed on those phases would apply to owners of the fourth phase of development of the subdivision were enforceable in equity as implied covenants against the owners of the fourth phase).

*Judgment reversed. Andrews, P. J., and Miller, J., concur.*